**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AARON A. GIPSON, | ) | CASE NO. 3:13-cv-1997 |
| | ) | |
| PETITIONER, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| ED SHELDON, WARDEN, | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| RESPONDENT. | ) | |

Before the Court is the Report and Recommendation of a magistrate judge (Doc. No. 15 ["R&R"]) recommending denial and dismissal of this petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. No. 1 ["Petition"]). Petitioner, who is represented by counsel, filed objections to the R&R. (Doc. No. 17 ["Obj."].) Respondent filed neither his own objections nor any response to petitioner's objections. Pursuant to Fed. R. Civ. P. 72(b)(3), the Court has conducted its de novo review of the matters raised in the objections. For the reasons discussed below, the R&R is accepted and the petition is dismissed.

**I. FACTUAL BACKGROUND**

On a petition for habeas corpus brought pursuant to 28 U.S.C. § 2254, there is a presumption that the factual findings of the state court are correct, absent clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The R&R adopts the facts as set forth by the Sixth District Court of Appeals of Ohio on Gipson's direct appeal. Gipson has not specifically objected to these facts:

{¶ 4} … In March 2008, appellant and an accomplice, Thomas Ricks, both of Detroit, Michigan, traveled to the Sandusky, Ohio residence of Chanel Harper, the sister of an area drug dealer, Calvin Harper, Jr. The underlying purpose of the trip to Ohio was for appellant to collect money owed for marijuana that appellant had previously supplied to Chanel. In conjunction with this, Chanel and appellant were also engaged in an intimate relationship at this time. Chanel was aware that her brother was actively involved in drug trafficking.

{¶ 5} At some point, appellant and Ricks left Chanel's home and returned to Michigan. The following morning, Chanel called appellant. Appellant indicated to her that he would be coming back to Sandusky later that day in order to deliver marijuana to her. At approximately 2:30 p.m., Calvin Harper went to his mother's house to pick up $3,000 in connection to a pending drug deal. After Harper had arrived back at his home with the funds, he phoned his neighbor, Rhonda Farris, and advised her to come by and pick up cash that she had previously asked to borrow.

{¶ 6} While at Harper's house to borrow money, Farris noticed two large stacks of money, totaling $20,000, sitting on Harper's stove. Farris observed that some of the money had apparently fallen onto the floor. Farris asked Harper if she could take that money as well. Harper refused to allow her to take the additional money. Farris returned next door to her residence. At approximately 5:00 p.m., Farris observed a man, whom she did not recognize, coming up her front steps. Farris later identified appellant[1] as the man she had observed. Farris next observed appellant turn around and walk up the sidewalk to Harper's adjacent house. Farris called Harper to warn him about the approaching stranger. Harper indicated that he was expecting this visitor. Harper replied to Farris, "Oh, he cool, he cool, that's my dude."

{¶ 7} Later that night Farris observed Ricks leaving Harper's house. Farris tried to call Harper. She received no answer. Harper's girlfriend, Jessica King, left Harper's house around 4:30 p.m. because Harper told her that he had a meeting with appellant and another party. Upon returning to Harper's around 10:00 p.m., King could not gain access to the house. All of the doors were locked.

{¶ 8} The next morning Farris called Harper's mother to voice her concern about not being able to contact Harper. His mother told Farris to go to the house to check on him. She knew Farris had a way to get into the house. Upon gaining entry, Farris saw Harper lying on the floor and called for emergency assistance. In response to the call, detectives arrived on the scene. Harper had no pulse. It appeared that he had been dead for some time. Chanel disclosed to the officers that she believed that her drug dealer, appellant, was involved in the death

---

[1] This is actually an error; Farris identified this person as Thomas Ricks, not Gipson. (Doc. No. 11-5, Tr. II at 1920-21.)

2

of her brother.  Appellant was located several days later.  He was arrested in Canton, Michigan on armed robbery charges.

{¶ 9} Appellant admitted that he had gone to Sandusky to engage in a drug transaction with Harper.  However, appellant also claimed that while driving to Sandusky at approximately 5:15 p.m. he called Harper on his cell, changed the plans, turned around, and headed back towards Michigan.  Although appellant's cell phone records do reflect a mobile call to Harper at 5:15 p.m., the cell records further reflect hits off two separate towers in Sandusky at 5:48 p.m. and 5:52 p.m., more than 45 minutes after appellant claimed to have left Sandusky.  Thus, appellant's alibi does not comport with the objective evidence in the record.

(Doc. No. 10-66 at 771-73,[2] footnote added.)

## II. PROCEDURAL BACKGROUND

Petitioner was indicted by a grand jury on six counts, including two counts of aggravated murder, two counts of aggravated robbery, one count of trafficking in marijuana, and one count of trafficking in cocaine. The aggravated murder charges were each accompanied by a death penalty specification and a firearm specification, and the aggravated robbery charges each had a firearm specification. (Doc. No. 10-1.) Petitioner entered not guilty pleas to all counts. (Doc. No. 10-5 at 141.) On October 15, 2009, the trial court granted the State's motion to dismiss the death penalty specifications. (Doc. No. 10-15.) Subsequently, the parties stipulated that both drug offenses occurred near school premises. (Doc. No. 10-54.)

On June 22, 2010, following a jury trial in the Erie County Court of Common Pleas, petitioner was found guilty of one count of complicity to aggravated murder, one count of complicity to aggravated robbery, and two counts of complicity to trafficking in drugs. (Doc. No. 10-57.) He was acquitted on all other charges.

---

[2] All page number references are to the page identification number generated by the Court's electronic docketing system.

On July 13, 2010, Gipson was sentenced to a life term with eligibility for parole after 30 years for complicity to aggravated murder, with additional concurrent terms of 10 years for complicity to aggravated robbery, 5 years for trafficking in marijuana, and 10 years for trafficking in cocaine. (Doc. No. 10-60.)

Represented by counsel, petitioner filed a timely direct appeal.[3] On February 10, 2012, the Sixth District Court of Appeals of Ohio affirmed the judgment of the trial court. (Doc. No. 10-66), and later denied petitioner's application for reconsideration and for en banc consideration.[4] (Doc. No. 10-69.) Represented by new counsel,[5] petitioner sought review by the

---

[3] Petitioner asserted six assignments of error:

1. Mr. Gipson's due process rights were violated as his convictions are against the manifest weight of the evidence.

2. The evidence presented was insufficient to sustain a conviction and, as a matter of law, Mr. Gipson's conviction should be vacated.

3. The court violated Mr. Gipson's due process rights under the 14th Amendment and his right to the effective assistance of counsel under the 6th Amendment by allowing testimony of an experiment that was not disclosed in discovery, prior to trial, to the defense.

4. Mr. Gipson's due process rights were violated by the Sandusky police's destruction of "materially exculpatory" evidence in violation of his 5th and 14th Amendment protections.

5. The trial court erred in denying Mr. Gipson's motion to suppress cell phone records in direct violation of Mr. Gipson's rights under the 4th and 14th amendments to the federal constitution and Section 14, Article I of the Ohio Constitution.

6. Appellant's convictions must be reversed because the indictment failed to charge any gun specifications on any counts under R.C. 2941.145 in violation of appellant's state constitutional right to a grand jury indictment and his state and federal constitutional rights to due process and effective assistance of counsel.

(Doc. No. 10-62 at 635.)

[4] Gipson asserted three errors as a basis for reconsideration and/or en banc consideration:

1. [The state appellate] court's February 10, 2012 holding was in error because it ruled that Mr. Gipson's conviction was not against the manifest weight of evidence and there was sufficient evidence while believing eyewitness testimony existed that placed Mr. Gipson at the murder scene.

2. [The state appellate] court erred in ruling that cell phone record location data is not "content" and that citizens do not have a reasonable expectation of privacy in such "content."

3. Extraordinary circumstances make en banc consideration appropriate.

(Doc. No. 10-67 at 782, 783, 784.)

4

Ohio Supreme Court.[6] On June 20, 2012, the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question. (Doc. No. 10-73.)

Still represented by counsel, petitioner filed an application to reopen his appeal pursuant to Ohio App. R. 26(B),[7] which was denied on June 6, 2012. (Doc. No. 10-77.)

---

[5] Petitioner's current habeas counsel made his first appearance in this case at the time of petitioner's direct appeal to the Ohio Supreme Court. (*See* Doc. No. 10-70.) He has remained his counsel since then.

[6] In his memorandum in support of jurisdiction, petitioner raised the following propositions of law:

1. Gipson's convictions are based on insufficient evidence in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

2. Gipson's convictions in this case are against the manifest weight of the evidence.

3. Gipson's due process rights were violated by the State's loss or destruction of the original digital recording of SPD's March 19 interview with Gipson, in violation of Gipson's rights under the 5th and 14th Amendments.

4. The trial court erred in denying Gipson's motion to suppress cell phone records and cell location data in direct violation of Gipson's rights under the 4th and 14th Amendments of the U.S. Constitution and Section 14, Article I of the Ohio Constitution.

5. The trial court violated Gipson's due process rights under the 14th Amendment and his right to the effective assistance of counsel under the 6th Amendment by allowing testimony of an experiment by the State's expert that was not disclosed to the defense prior to trial.

(Doc. No. 10-71 at 803.)

[7] Petitioner asserted that his original appellate counsel had been ineffective for failing to raise the following grounds for relief:

1. Gipson was denied his constitutional right to a fair trial by an impartial jury when the trial court failed to excuse for cause potential jurors with disqualifying biases (actual and/or implied) and when this failure resulted in Gipson being tried before a jury that included biased jurors.

2. Prosecutorial misconduct denied Gipson a fair trial and his right to due process because the State relied in Gipson's trial on an inaccurate timeline of events that was materially different in key respects than that presented by the State in Gipson's co-defendants' [sic] trial, revealed in police reports, and/or as found by the appellate court in the co-defendant's case.

3. Prosecutorial misconduct during closing argument denied Gipson a fair trial and his right to due process in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and Section 10, Article I of the Ohio Constitution.

4. Gipson's trial counsel was ineffective for not including in the trial record, and not developing and arguing to the jury, the substantial gaps and material inconsistencies in the State's case against Gipson as revealed in testimony in Thomas Ricks' trial, in the police reports of the investigation provided in discovery, and in the State's own exhibits.

(Doc. No. 10-74 at 858, 860-61, 864, 865.)

Petitioner next sought review by the Ohio Supreme Court,[8] but that was denied on September 26, 2012. (Doc. No. 10-81.)

This federal habeas petition followed. Represented by counsel, Gipson raises the following grounds for relief:

1.  Gipson's convictions are based on insufficient evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

2.  Gipson's due process rights were violated by the State's loss or destruction of the original digital recording of SPD's March 19 interview with Gipson, in violation of Gipson's rights under the 5th and 14th Amendments.

3.  The State courts' failure to suppress cell phone records and cell location data violated Gipson's rights under the 4th and 14th Amendments of the U.S. Constitution.

4.  Gipson's due process rights under the 14th Amendment and his right to the effective assistance of counsel under the 6th Amendment were violated

---

[8] Petitioner asserted five propositions of law:

1.  Prosecutorial misconduct denied Gipson a fair trial and his right to due process because the State relied in Gipson's trial on an inaccurate timeline of events that was materially different in key respects than that presented by the State in Gipson's co-defendants' [sic] trial, revealed in police reports, and/or as found by the appellate court in the co-defendant's case.

2.  Prosecutorial misconduct during closing argument denied Gipson a fair trial and his right to due process in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and Section 10, Article I of the Ohio Constitution.

3.  Gipson's trial counsel was ineffective for not developing and arguing to the jury the substantial gaps and material inconsistencies in the State's case against Gipson as revealed in testimony in the Ricks' [sic] trial, in the police reports of the investigation, and in the State's own exhibits.

4.  Gipson was denied his constitutional right to a fair trial by an impartial jury when the trial court failed to excuse for cause potential jurors with disqualifying biases (actual and/or implied) and when this failure resulted in Gipson being tried before a jury that included biased jurors.

5.  Appellate counsel provided ineffective assistance to Gipson by failing to ensure there was a complete record for appeal and also by failing to properly raise meritorious constitutional issues in Gipson's direct appeal, all in violation of the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution.

(Doc. No. 10-79 at 989.)

by State trial court's allowance of testimony of an experiment by the State's expert that was not disclosed to the defense prior to trial.

5.      Gipson was denied his constitutional right to a fair trial by an impartial jury when the trial court failed to excuse for cause potential jurors with disqualifying biases (actual and/or implied) and when this failure resulted in Gipson being tried before a jury that included biased jurors.

6.      Prosecutorial misconduct denied Gipson a fair trial and his right to due process because the State relied in Gipson's trial on an inaccurate timeline of events that was materially different in key respects than that presented by the State in Gipson's co-defendants' [sic] trial, revealed in police reports, and/or as found by the Ohio appellate court in the co-defendant's case.

7.      Prosecutorial misconduct during closing argument denied Gipson a fair trial and his right to due process in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution.

8.      Gipson's trial counsel was ineffective for not developing and arguing to the jury the substantial gaps and material inconsistencies in the State's case against Gipson as revealed in testimony in the Ricks' [sic] trial, in the police reports of the investigation, and in the State's own exhibits.

9.      Appellate counsel provided ineffective assistance to Gipson by failing to ensure there was a complete record for appeal and also by failing to properly raise meritorious constitutional issues in Gipson's direct appeal, all in violation of the Fourteenth Amendment to the United States Constitution.

# III. DISCUSSION

## A.      The Standard of Review

Under 28 U.S.C. § 636(b)(1)(C), "[a] judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Powell v. United States*, 37 F.3d 1499 (Table), 1994 WL 532926, at *1 (6th Cir. Sept. 30, 1994) ("Any report and recommendation by a magistrate judge that is dispositive of a claim or defense of a party shall be subject to de novo review by the district court

in light of specific objections filed by any party."). "An 'objection' that does nothing more than state a disagreement with a magistrate's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *Aldrich v. Bock*, 327 F. Supp. 2d 743, 747 (E.D. Mich. 2004). *See also* Fed. R. Civ. P. 72(b)(3) ("[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to"); LR 72.3(b) (any objecting party shall file "written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections."). After review, the district judge "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

When undertaking its de novo review of any objections to the R&R, this Court must be additionally mindful of the standard of review applicable in the context of habeas corpus. "Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, a federal court may grant habeas relief only when a state court's decision on the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by' decisions from [the Supreme] Court, or was 'based on an unreasonable determination of the facts.' 28 U.S.C. § 2254(d)." *Woods v. Donald*, --U.S.--, 135 S. Ct. 1372, 1376 (2015) (per curiam). This standard "is intentionally difficult to meet." *Id.* (internal quotation marks and citations omitted). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

8

"[F]ederal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* "Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. This is especially true for claims of ineffective assistance of counsel, where AEDPA review must be doubly deferential in order to afford both the state court and the defense attorney the benefit of the doubt." *Id.* (internal quotation marks and citations omitted).

## B.      De Novo Review

Petitioner has raised objections to the R&R's conclusions with respect to grounds one, two, three, four, and nine, as well as the conclusion that grounds five through eight are procedurally defaulted. The question of procedural bar is closely linked to ground nine, which claims ineffective assistance of appellate counsel as the cause for his procedural default of grounds five through eight.

### 1.      Ground One

Petitioner asserts that his due process rights were violated because he was convicted of complicity in both the aggravated murder and the aggravated robbery of the victim without proof beyond a reasonable doubt of all elements of each crime. He asserts that "the evidence is constitutionally insufficient to meet the State's burden[.]" (Petition at 22.) He claims that "[a] careful review of the evidence reveals that speculation, innuendo, stacked inferences, and blind conjecture have been relied upon in place of reasonable inferences and reliable evidence." (*Id.*) He further asserts that the case against him was "entirely circumstantial and exceedingly flimsy." (*Id.* at 23.)

9

The R&R applied *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), to conclude that "[v]iewing the evidence in a light most favorable to the State, the evidence, albeit circumstantial, is sufficient to support [p]etitioner's convictions." (R&R at 2940.) In objection, petitioner argues that his challenge is not merely a challenge to the circumstantial nature of the State's proof. Rather, his claim is that the evidence, whether circumstantial or otherwise, fails to establish the requisite proof beyond a reasonable doubt of the essential elements of the crimes. He claims "[t]here is simply no proof, only speculation, that [he] had the specific intent and/or purpose to kill Harper, that [he] shared the principal's intent to kill Harper (or that he even knew that Harper would be killed), or that [he] had any knowledge of or aided in the aggravated robbery of Harper." (Obj. at 2971, emphases and citation omitted).

As pointed out in *Jackson*, the question is not whether this Court itself believes that the evidence established guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 318-19. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original, citation omitted). "And a state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable." *Parker v. Matthews*, – U.S. –, 132 S. Ct. 2148, 2152, 183 L. Ed. 2d 32 (2012) (per curiam) (internal quotation marks and citation omitted). *Jackson* "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, – U.S. –, 132 S. Ct. 2, 6, 181 L. Ed. 2d 311 (2011) (quoting *Jackson*, 443 U.S. at 326).

10

The state court of appeals, addressing this same challenge to the sufficiency of the

evidence, stated:

> {¶ 14} The record shows that at trial appellee presented extensive cell phone records that carefully tracked appellant's whereabouts throughout the night. Appellant argued a lack of direct evidence and disputed witness credibility.
>
> \* \* \*
>
> {¶ 16} The underlining inquiry we must resolve is whether a rational trier of fact could have found the disputed elements of the crime established beyond a reasonable doubt. *State v. Wilson*, 8th Dist. No. 84593, 2005-Ohio-511.
>
> {¶ 17} We have carefully reviewed and considered the record evidence. Appellant characterizes the witnesses in this case as, "a slew of drug dealing family members." However, we note that the fact that the family members were willing to reveal their own unlawful conduct in the course of this matter could reasonably be perceived as indicia of their credibility. The jury in this case found the statements by appellee's witnesses, including not only family members but also numerous police officers and experts, to be credible and sufficient for conviction.
>
> {¶ 18} We find no evidence reflecting that the factfinder lost its way or created a manifest miscarriage of injustice. On the contrary, we find that the record contains ample evidence in support of conviction. …

(Doc. No. 10-66 at 774-75.) The R&R, after correctly articulating the essential elements of the

crimes of complicity to commit aggravated murder and complicity to commit aggravated

robbery, set forth in more detail the available record evidence that would verify the state court's

conclusion that "the record contains ample evidence in support of conviction." (*See* R&R at

2938-40 [quoting *Gipson*, 2012 WL 432851, at *3].)

Petitioner, in his objections, marshals a whole different evidentiary scenario from

the record to make his argument that, "[a]t best, the State's 'evidence' casts suspicion on Gipson,

but mere suspicion is not enough to convict him of these serious crimes." (Obj. at 2974.) But it is

not this Court's role to re-weigh the evidence, to make factual findings, and/or to draw

inferences from those facts. This Court's role in the habeas context is to determine whether any rational trier of fact could have found all the essential elements of the crimes that underlie petitioner's challenge in ground one.

As properly pointed out by the R&R and left unchallenged by petitioner, to find Gipson guilty of complicity, the jury had to find that the evidence showed that he "supported, assisted, encouraged, cooperated with, advised or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Jackson*, 863 N.E.2d 223, 226 (Ohio Ct. App. 2006). This can be proven by either direct or circumstantial evidence, or both.

Here, the record establishes that Gipson came from Michigan to Ohio on March 10, 2008 to socialize with the victim's sister, Chanel Harper, with whom he had a relationship. He was also planning to bring her marijuana and to collect money from her for marijuana he had given her on another occasion. (Doc. No. 11-5 ["Tr. II"] at 1875-76, 1877.) When Gipson arrived at Chanel's home, Crystal Pool (Chanel's best friend) was there; Gipson had Thomas Ricks with him, whom Chanel did not know. (*Id.* at 1876.) Gipson and Ricks left Chanel's house around 1:00 a.m. (*Id.* at 1877.) On March 11, 2008, Chanel called Gipson around at 9:01 a.m. and he told her he would come to her home with the promised marijuana, but he never came. (*Id.* at 1881-83.)

On March 11, 2008, around 2:30 p.m., the victim, Calvin Harper ("Harper"), went to his mother's home to pick up $3,000 in cash in anticipation of a drug deal. (Doc. No. 11-6 ["Tr. III"] at 2100-01.) Later that day, around 5:15 p.m., Harper's neighbor, Rhonda Farris, went to Harper's home to borrow $20. (Tr. II at 1918, 1924.) While she was there, she observed Harper with $20,000, which he had for purposes of a drug deal. (*Id.* at 1925.) About a half hour

12

later, Rhonda observed a stranger (who turned out to be Ricks) approaching her front door. (*Id.* at 1920.) When Ricks realized he was at the wrong house, he went next door to Harper's house. Rhonda phoned Harper to warn him that someone was coming, and she was assured by Harper that this was the man he was expecting. (*Id.* at 1921.) After Rhonda saw Ricks leave Harper's home, she tried to call him, but Harper never answered. (*Id.* at 1927.) Harper's mother also testified that, after he left her house around 3:00 p.m., she went to Chanel's to play cards with Chanel and several others; she was there until around 10:00 or 11:00 p.m. They tried calling Harper several times but he never answered. (Tr. III at 2102-03.)

Harper's girlfriend, Jessica King, testified that she left his house around 4:30 p.m., because she knew he was planning to meet Gipson and another individual; she went to Chanel's. (*Id.* at 2038-39.) She and Harper had planned that she would return and spend the night, but, after she left Chanel's around 10:30 p.m., she could not gain entry to Harper's house. His doors were locked, which, to Jessica, was strange because he had lost his key the weekend before and had been leaving the back door unlocked. She banged on the doors and windows, but got no answer. She noticed a light in the kitchen and saw that the television was on. Although "[s]omethin' just didn't seem right," she went home. (*Id.* at 2039-40.) She tried calling him multiple times that night, but got no answer. By the next morning when she still had not heard from Harper, she called his mother around 7:00 a.m. His mother also had no information. (*Id.* at 2040-41.) Jessica called her own daughter and the two of them went to Harper's home, forced their way in, and found him dead at around 10:30 a.m. on March 12, 2008. They immediately called 911. (Tr. II at 1930-31.) The officers who responded to the 911 call confirmed that Harper appeared to have been dead for hours. (*Id.* at 1835-36.) His home was in order and there was no sign of a struggle. They did not find any large amounts of money. (*Id.* at 1837.)

13

During the investigation of the murder, Gipson's phone records were subpoenaed after Chanel advised the police that he had traveled from Michigan for a drug transaction with Harper. (Tr. III at 2124-25.) Cell tower records were also obtained (*Id.* at 2127-28), and using those, the investigating officers were able to map Gipson's journey from Canton, Michigan to Sandusky, Ohio for the relevant time period. (*Id.* at 2132.) There was considerable testimony as to how they were able to link his phone calls to Harper and to Chanel and how, using cell tower records, they linked his locations to all the locations where Ricks had been.

Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found all the elements of the crimes of complicity for which Gipson was convicted, including the requisite intent, which "may be inferred from presence, companionship and conduct before and after the offense is committed." *State v. Johnson*, 754 N.E.2d 796, 801 (Ohio 2001) (quoting *State v. Pruett*, 273 N.E.2d 884, 887 (Ohio Ct. App. 1971)).

Gipson's objection with respect to the R&R's conclusion as to Ground One is overruled.

2.      **Ground Two**

In this ground, petitioner asserts that his due process rights were violated by the State's loss or destruction of the original digital recording of the police department's March 19, 2008 interview of petitioner. The R&R concluded that the state appellate court's decision to reject this argument was neither contrary to nor an unreasonable application of Supreme Court precedent, and that it was not an unreasonable determination of the facts. Petitioner objects to this conclusion. Petitioner's objection raises nothing that was not already raised in the petition and the traverse, in virtually identical language; petitioner simply disagrees with the R&R. Even so, the Court has re-examined petitioner's argument and found it lacking.

14

As properly noted by the R&R, the Supreme Court has addressed the issue of whether the Fourteenth Amendment requires the State to "take affirmative steps to preserve evidence on behalf of criminal defendants." *California v. Trombetta*, 467 U.S. 479, 486, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984). The Court noted the precise problem: "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Id.* (citation omitted). The Court concluded that, to establish a constitutional violation, there must be some showing of "a calculated effort to circumvent the disclosure requirements established in *Brady v. Maryland*, [373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] and its progeny." *Id.* at 488. Moreover, to the extent any duty to preserve evidence exists, it "must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Id.*. But, where the State "fails to preserve evidence whose exculpatory value is indeterminate and only 'potentially useful' to the defendant, . . . the defendant must show: (1) that the government acted in bad faith in failing to preserve the evidence; (2) that the exculpatory value of the evidence was apparent before its destruction; and (3) that the nature of the evidence was such that the defendant would be unable to obtain comparable evidence by other reasonably available means." *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (citing *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988); *Trombetta*, 467 U.S. at 488-89).

Detective Gary Wichman, who interviewed Gipson in Canton, Michigan on March 19, 2008, testified that the interview room contained no recording equipment, so he used a digital recorder, but took no written notes. (Doc. No. 11-7 ["Tr. IV"] at 2253.) Within a few days after the interview, Wichman discovered that the quality of the recording was "horrible," and "you couldn't hear anything." (*Id.* at 2254.) Wichman gave no thought to re-interviewing

15

Gipson. Instead, six days after the interview, he prepared a written summary. (*Id.* at 2254-55.) At the time, Wichman was unaware that a poor quality digital recording could sometimes be enhanced, and, at trial, he had no idea what had happened to the actual recording. (*Id.* at 2255-56.) This was the only recording made during this investigation that was missing at the time of trial. (*Id.* at 2256.) Gipson's counsel availed himself of the opportunity to vigorously cross-examine Wichman regarding areas of his written summary that Gipson denied were true or accurate.

Gipson has not met the test articulated in *Trombetta* and *Youngblood*. He has not established that there was likely anything exculpatory in the recorded interview and/or that it contained information that could have played a significant role in his defense; he has shown no attempt on the part of the State to elude the disclosure requirements of *Brady*, nor has he shown any bad faith. Gipson argues nothing but speculation. As already noted, his trial counsel challenged the written summary, but, apparently, the jury credited Wichman's testimony about the interview.

To the extent petitioner has even raised a true objection to the R&R's reasoning, as opposed to simply recycling his original argument, such objection is overruled.

**3.     Ground Three**

In this ground, petitioner asserts that his Fourth and Fourteenth Amendment rights were violated because the State obtained his cell phone records and cell site location data through use of a subpoena rather than a warrant. The argument in his objection is virtually identical to the argument in the petition, except for its new reliance upon a recently decided Supreme Court case, which this Court will address.

16

The R&R rejects the argument petitioner initially made that his case is factually and legally similar to *United States v. Jones*, – U.S. –, 132 S. Ct. 945, 949, 181 L. Ed. 2d 911 (2012), where the Court held that the government's physical occupation of a person's vehicle by means of a GPS tracking device was a "search" within the meaning of the Fourth Amendment. In his objection, petitioner does not identify any error in the R&R's conclusion that his case "presents no such facts of any physical intrusion and therefore is not analogous." (R&R at 2944.) Moreover, an Eleventh Circuit case that petitioner identifies as having found *Jones* "instructive" in reaching its conclusion that warrantless gathering of cell site location information violates the Fourth Amendment has actually been vacated and is currently undergoing en banc review in that circuit. *See United States v. Davis*, 754 F.3d 1205 (11th Cir.), *opinion vacated and en banc rehearing granted*, 573 F. App'x 925 (11th Cir. 2014).

This Court has already decided that "there is no reasonable expectation of privacy in cell phone records, … or in cell site location information." *United States v. Dye*, No. 1:10CR221, 2011 WL 1595255, at *9 (N.D. Ohio Apr. 27, 2011) (citing *Smith v. Maryland*, 442 U.S. 735, 744, 99 S. Ct. 2577, 61 L. Ed. 2d 220 (1979); *United States v. Benford*, No. 2:09 CR 86, 2010 WL 1266507, at *2-3 (N.D. Ind. Mar. 26, 2010); *United States v. Suarez-Blanca*, No. 1:07-CR-0023-MHS/AJB, 2008 WL 4200156, at *8 (N.D. Ga. Apr. 21, 2008)). Petitioner's reliance upon *Riley v. California*, – U.S. –, 134 S. Ct. 2473 (2014), which was decided after the briefing in this case (albeit before the R&R issued), does not persuade the Court otherwise.

In *Riley*, the Court addressed the question of whether the police may, without a warrant, search digital data stored on cell phones seized from individuals incident to lawful arrests. The Court reviewed the "search incident to arrest trilogy" consisting of *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), *United States v. Robinson*,

17

414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), and *Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009), and concluded that "officers must generally secure a warrant before conducting such a search." *Riley*, 134 S. Ct. at 2485. Petitioner argues that *Riley* stands for the proposition that he had a reasonable expectation of privacy in his cell phone records and the cell tower data and that, therefore, a warrant was required to obtain them. But, as in *Benford*, cited by this Court in *Dye*, the cases relied upon by petitioner, including *Riley*, involved "in-person, physical searches of a cell phone itself and the text messages and/or call records located on the phone." *Benford*, 2010 WL 1266507, at *3 (citations omitted). All of the cases relied upon by petitioner are factually different from the instant case where no information was gathered directly from the phone itself.

This objection is overruled.

### 4. Ground Four

In this ground, petitioner asserts that his due process rights, as well as his right to the effective assistance of counsel, were violated by the trial court's allowance of expert testimony about the results of an "experiment" that was not disclosed to the defense before trial.

The R&R concluded that this ground is not cognizable in habeas since there is no constitutional right to discovery in a criminal case. (R&R at 2945.)

Petitioner objects, arguing that the state trial court's decision to permit this "surprise" testimony rendered his trial arbitrary and fundamentally unfair, in violation of the Fourteenth Amendment. He also asserts that this claim was raised before the state courts as a constitutional violation, not merely as a violation of state discovery rules.

Petitioner's objection is not well-taken. In his motion for mistrial or, alternatively, to strike testimony (Doc. No. 10-55), although petitioner stated that disclosure of this

18

"experiment" and its "test results" "were required to be disclosed under Crim. R. 16(B)(1)(d) and the Fourteenth Amendment of the federal constitution[,]" (*Id.* at 546), and further that his "right to a fair trial under the Fourteenth Amendment" had been violated, his entire argument was based solely on Ohio's criminal rules. (*Id.* at 546-47.) Even in his appellate brief (Doc. No. 10-62), although claiming a denial of a fair trial and of his right to effective assistance of counsel, once again his argument was based exclusively on Ohio's criminal rules.

This objection is overruled.

### 5. Grounds Five through Nine

There is no question that grounds five through eight were not raised on direct appeal, but were first raised by petitioner in his Ohio App. R. 26(B) application to reopen his appeal.[9] There, represented by new counsel, petitioner asserted that he was ineffectively represented by his direct appeal counsel due to that counsel's failure to raise the challenges now raised in grounds five through eight. Here, in ground nine, he argues that this ineffective assistance of appellate counsel constitutes the requisite cause and prejudice to excuse any procedural default, thus permitting review of grounds five through eight by this Court. Petitioner made these very same arguments in his Rule 26(B) application to reopen and the state court of appeals rejected them, concluding that his direct appeal counsel was not ineffective for failing to raise the identified issues. (*See* Doc. No. 10-77.)

Petitioner argues here that the state court's adjudication of this ineffectiveness claim in his Rule 26(B) proceeding was contrary to, or involved an unreasonable application of,

---

[9] Ohio App. R. 26(B)(1) provides, in relevant part, that "[a] defendant in a criminal case may apply for reopening of the appeal from a judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel." The application "shall be granted if there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal." Ohio App. R. 26(B)(5). If the appellate court denies the application, "it shall state in the entry the reasons for denial." Ohio App. R. 26(B)(6).

clearly established Federal law, and/or is an unreasonable determination of the facts in light of the evidence presented in the state court. (Petition at 46-47.)

Although the R&R's presentation of these grounds is not crystal clear, when read as a whole, it is apparent that the R&R properly started with ground nine. After examining each of the four issues that appellate counsel did not raise on direct appeal (i.e., lack of impartial jury, prosecutorial misconduct by reliance on a timeline materially different from that used in his co-defendant's trial, prosecutorial misconduct during closing argument, and ineffective assistance of trial counsel due to failure to include in the record testimony and exhibits from his co-defendant's trial),[10] the R&R determined that, since petitioner has failed to substantiate any of his supporting claims, there is no basis to disturb the State appellate court's judgment that failing to raise these claims did not constitute ineffective assistance by appellate counsel. (R&R at 2953.) The R&R then concludes that "[b]ecause [p]etitioner has failed to demonstrate his appellate counsel was ineffective …, he fails to demonstrate cause sufficient to excuse the default [of grounds five through eight]." (*Id.* at 2954.)

In his objections, petitioner first argues that grounds five through eight are not procedurally defaulted because they were "fairly presented" to the Ohio courts in his Rule 26(B) application. (Obj. at 2984.) This, however, misconstrues the scope of those proceedings, which is solely to examine whether there was ineffective assistance of appellate counsel so as to supply a

---

[10] In his petition, Gipson also argues that his appellate counsel gave ineffective assistance by failing to ensure that there was "a complete record before the appellate court of all relevant papers, transcripts, and proceedings[.]" (Petition at 45.) In particular, he cites counsel's failure to put before the appellate court "the testimony of witnesses in the trial of [his] co-defendant (Thomas Ricks), which occurred earlier in the same court and was available to all counsel and the court during [his] trial," and various exhibits from Ricks's trial. (*Id.*) This argument is related to ground eight, where Gipson claims ineffective assistance of *trial* counsel for failure to get some of this same information before his jury during the course of his trial. Gipson makes no direct mention of this aspect of ground nine in his reply (styled as a "traverse") to respondent's answer (styled as a "return of writ"). The R&R makes no direct mention of it either, although the R&R does tangentially address it as part of ground eight. Petitioner's objections also raise no direct mention of this aspect of ground nine. Therefore, the Court considers this issue waived insofar as it relates to ground nine's claim of ineffective assistance of *appellate* counsel.

reason to reopen the direct appeal. A Rule 26(B) application preserves for habeas review only the claim of ineffective assistance of appellate counsel, not the underlying substantive claims and arguments. *Wogenstahl v. Mitchell*, 668 F.3d 307, 338 (6th Cir. 2012) (citing *Lott v. Coyle*, 261 F.3d 594, 612 (6th Cir. 2001) (procedural default of a substantive claim cannot be avoided by raising it in a Rule 26(B) application as that "would eviscerate the continued vitality of the procedural default rule")); *see also Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (holding that, to exhaust a claim, a petitioner must present it "to the state courts under the same theory in which it is later presented in federal court.").

Therefore, to the extent petitioner objects to a conclusion that grounds five through eight are procedurally defaulted, that objection is overruled. Although the ineffective assistance of appellate counsel claim has itself been preserved for habeas review, the only way petitioner can obtain review of the defaulted underlying grounds five through eight is by first establishing that his appellate counsel actually *was* ineffective in his representation on direct appeal, and then make a showing under the cause and prejudice standard.

To succeed in this Court on ground nine, petitioner must first show "deficient performance," which means he must demonstrate that his appellate counsel "made an objectively unreasonable decision by choosing to raise other issues" instead of the four issues in grounds five through eight, meaning those four issues were "clearly stronger than issues that counsel did present." *Webb v. Mitchell*, 586 F.3d 383, 399 (6th Cir. 2009) (quoting *Smith v. Robbins*, 528 U.S. 259, 285, 288, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000)); *McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000) (must show "errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions")

(citing, among authorities, *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

"[Appellate] counsel has no obligation to raise every possible claim, and the decision of which among the possible claims to pursue [on appeal] is ordinarily entrusted to counsel's professional judgment[.]" *McFarland v. Yukins*, 356 F.3d 688, 710 (6th Cir. 2004) (citing, among authorities, *Smith v. Murray*, 477 U.S. 527, 536, 106 S. Ct. 2661, 91 L. Ed. 2d 434 (1986)). The mere omission of these claims from his direct appeal is not *per se* proof of counsel's ineffectiveness. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689 (citation omitted). "Because of the difficulties inherent in making the evaluation [of counsel's conduct], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id*.

Even *if* this Court were to agree that petitioner's direct appeal counsel was ineffective for failing to raise the four claims in grounds five through eight (which it does not conclude, finding no error in the R&R's analysis), petitioner would still need to clear the cause-and-prejudice hurdle; that is, he would need to show that this ineffective assistance was the cause for his default of grounds five through eight, and, as a result, that he was actually prejudiced because the result of *his appeal* would have been different had any or all of these underlying grounds been raised.[11] *Cole v. Thompson*, 501 U.S. 722, 749, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991). This he cannot do, and, absent such showing, there can be no merits review of the defaulted grounds.

---

[11] In the alternative, he could establish that failure to consider the claims would result in a fundamental miscarriage of justice. But, petitioner has not made this argument.

"[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). Absent a showing of "some objective factor external to the defense" that prevented his original appellate counsel (who was also his trial counsel) from raising these issues on direct appeal, this Court must presume that counsel simply chose a particular strategy for the direct appeal. Petitioner fails to show (and fails to even argue) that there was some objective factor *external* to the defense that prevented his counsel from raising these four issues on direct appeal. He merely argues that no competent counsel would have failed to raise them. The Court cannot reach that conclusion in its limited role as a habeas court.

Moreover, and importantly, petitioner also fails to establish that he was prejudiced. It is not a foregone conclusion that raising any or all of these issues (which he characterizes as "strong issues that should not have been omitted") would have made a difference to the outcome of *his appeal*. Ordinarily, when ineffective assistance of appellate counsel is raised in the habeas context, the argument is being made that, had certain issues been raised on direct appeal, the appeal would have succeeded and the person would have been granted a new trial or a resentencing. But, here, there is an intermediate layer of review in the form of the Rule 26(B) application to reopen the appeal due to ineffective assistance of direct appeal counsel. As a result, this Court's consideration of the prejudice prong turns on whether, had the original direct appeal counsel raised the four issues, the direct appeal would have turned out differently, resulting in a new trial for Gipson.

That question has already been answered in the negative by the state court of appeals. That court noted that the record it originally reviewed on direct appeal "contain[ed]

23

ample evidence in support of conviction." (Doc. No. 10-77 at 982.) It also noted that the record it reviewed on petitioner's Rule 26(B) motion for reconsideration and en banc rehearing contained "a wealth of evidence and testimony in support of [the] determination that appellant's conviction was not against the manifest weight of the evidence and was supported by sufficient evidence." (*Id.*) Given these findings, the court of appeals declined to reopen the appeal and/or issue any corrective order.

Without establishing that his appellate counsel was ineffective *and* that such ineffective representation was the cause for the adverse outcome of his appeal, resulting in actual prejudice, petitioner nonetheless asks this Court to ignore layer upon layer of deference that must be afforded to state court judgments by a federal habeas court. *See Woods v. Donald*, 135 S. Ct. at 1376 (the principle that federal habeas review is "not a substitute for ordinary error correction through appeal … is especially true for claims of ineffective assistance of counsel, where AEDPA review must be doubly deferential in order to afford both the state court and the defense attorney the benefit of the doubt") (internal quotation marks and citations omitted). This Court declines petitioner's request.

The objections with respect to grounds five through nine are overruled.

## IV. CONCLUSION

For the reasons discussed above, petitioner's objections to the R&R are overruled and the R&R is accepted. The petition for writ of habeas corpus is denied and the case is dismissed. Further, the Court certifies that an appeal from this decision could not be taken in good faith and that there is no basis upon which to issue a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).


**IT IS SO ORDERED**.


Dated: May 1, 2015

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

25